**UNITED STATES of America ex rel Constantino PERALES, M.D., Plaintiff,**

v.

**ST. MARGARET'S HOSPITAL, an Illinois Not for Profit Corporation, Defendant.**

Case No. 98–1354.

United States District Court, C.D. Illinois, Peoria Division.

Feb. 7, 2003.

Kenneth Joel Haber, Melinda McWhite, Rockville, MD, Richard Steagall, Nicoara & Steagall, Peoria, IL, for Plaintiff.

Daniel Purdom, Joseph Henry McMahon, Hinshaw & Culbertson, Lisle, IL, Stephen Morris, Douglass Marshall, Edward Habecker, Hinshaw & Culbertson, Peoria, IL, for Defendant.

### ORDER

MIHM, District Judge.

This matter is now before the Court on Plaintiff's Motion for Partial Summary Judgment (False Claims Relating to Practice Purchases) and numerous Motions for Partial Summary Judgment by Defendant. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment [# 194] is DENIED. Defendant's Motion for Summary Judgment Nos. 1, 2, 3, 4, 5, 6, 7, and 8 [# 185, # 186, # 187, # 188, # 189, # 190, # 191, and # 192] are GRANTED.

### FACTUAL BACKGROUND

Plaintiff, Constantino Perales ("Perales"), is a licensed physician in the State of Illinois and is currently practicing in the area of Occupational Medicine.[1] He previously had a contractual relationship with Defendant, St. Margaret's Hospital ("SMH"). SMH is located in Spring Valley, Illinois, and is engaged in providing health care services to the public. However, SMH also owns six community health centers in the surrounding area.

In late 1994, a dispute arose between Perales and SMH over payment allegedly due from Perales' practice. This dispute ultimately resulted in state court litigation. On October 21, 1998, Perales filed this action seeking to recover damages and civil penalties against SMH pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 and 3730, based on his allegations that SMH submitted fraudulent claims to the federal government for payment.

In part, Perales alleges that after 1995, SMH purchased a number of private medical practices and then immediately employed the selling physician or placed him/her under contract for services in the same practice. At various times, SMH signed contracts to purchase the medical practice of various physicians, including Dr. Shawn Bailey, Dr. Alejandro Bernal, Dr. Silvio Davito, Dr. Ramon Inciong, Dr. L.P. Lukancic, Dr. David Schlagheck, Dr. Vinai Pira, Dr. E.R. Ressurreccion, Jr., Dr. A.J. Sellett, and Dr. Margaret Stanmar (hereinafter referred to collectively as the "Selling Physicians"). With the exception of Dr. Stanmar, who died shortly after the purchase of her practice, each of the Selling Physicians became an employee of SMH for at least a year following the purchase; some of the Selling Physicians continue to be employed by SMH. In this employment capacity, each of the Selling Physicians referred patients to and ordered services from SMH.

---

1. This Court and the Magistrate Judge have been called upon numerous times to resolve disputes among counsel in both this case and its now-dismissed sister action, and the relevant facts have been set forth on more than one prior occasion. Accordingly, some degree of familiarity with the facts of the underlying relationship will be presumed.

Perales contends that the prices paid to the Selling Physicians were above fair market value and did not exclude the value to SMH of an expected stream of referrals and orders following the sale. Perales claims that the future referrals and orders violated both the Stark Statute's prohibition on referrals by physicians in financial relationships with a provider for designated health services and the Antikickback Statute's prohibition on offering and payment as inducement for the referral of health care services that may be paid for by federal health programs. Perales therefore maintains that because SMH did not disclose the existence of prohibited referrals in making claims for payment to the federal government while at the same time certifying the truth, accuracy, completeness, and correctness of its claims, those claims constituted false claims under the FCA.

Perales has now moved for partial summary judgment on this issue, and SMH has filed multiple motions for partial summary judgment. The matters are fully briefed, and this Order follows.

### LEGAL STANDARD

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,

2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 106 S.Ct. at 2511.

### DISCUSSION

■ This case is brought pursuant to the FCA. The FCA provides both criminal and civil penalties for presenting a false claim for payment against the Government. *United States v. Bank of Farmington*, 166 F.3d 853, 857 (7th Cir.1999). The terms of the FCA establish liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...

31 U.S.C. § 3729(a). It also includes a *qui tam* provision that allows a private party to bring suit on behalf of the United States to allege fraud upon the United States;

however, the United States retains an interest in the *qui tam* relator's suit. If the claim is proven, this party will receive a percentage of the recovery. *Bank of Farmington,* 166 F.3d at 857–58.

■ In an attempt to identify purportedly false claims for purposes of bringing this FCA action, Perales has attempted to derive falsity from claims submitted pursuant to allegedly illegal referral relationships in violation of the Antikickback Statute and Stark statute. The Antikickback Statute (the "AKS"), 42 U.S.C. § 1320a–7b, is a criminal statute which makes it a felony for:

> whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program. . . .

42 U.S.C. § 1320a–7b(b)(2). Thus, the AKS focuses on the circumstances surrounding the referrals themselves.

The Stark Act is designed to prevent abusive self-referrals. Under the Stark Act, a physician is prohibited from making any referral to a provider of designated health services if the physician has a "financial relationship" with the provider, unless an exception applies. 42 U.S.C.

§ 1395nn(a). Financial relationship is further defined as a compensation arrangement between the physician and the provider, and a compensation arrangement is defined as "any arrangement involving any remuneration between a physician (or immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C)." 42 U.S.C. § 1395nn(a)(2) and (h)(1)(A). Under this statute, a healthcare provider is prohibited from submitting claims to government payors for services rendered to patients referred in violation of the statute, and government payors are prohibited from paying such claims. 42 U.S.C. § 1395(g)(1).

### I. *Perales' Motion for Partial Summary Judgment and SMH's Motion No. 3*

Perales contends that by paying more than fair market value for the practice purchases noted above, SMH paid remuneration for referrals and therefore violated the AKS and Stark. Although Perales cites several portions of the statutes and implementing regulations, these are really irrelevant unless he can establish the central premise of his argument, which is that in purchasing the practices of the Selling Physicians, SMH paid more than fair market value. SMH denies that any of the practices purchases were for more than fair market value and has filed its own motion seeking summary judgment to this effect.[2]

■ As support for his claim, Perales offers a December 22, 1992, opinion letter from the Department of Health and Human Services Associate General Counsel,

---

**2.** SMH's motion also contains an argument based on the contracts of employment entered into with some of the Selling Physicians following the practice purchases. However, Perales concedes that there is no longer an issue in this case concerning the legality or propriety of the remuneration paid to these doctors under their employment contracts.

Office of Inspector General, to someone in the Internal Revenue Service as a standard for evaluating the fair market value concept. The letter states in relevant part:

[I]t is necessary to scrutinize the payments (including the surrounding facts and circumstances) to determine the purpose for which they have been made. As part of this undertaking, it is necessary to consider the amounts paid for the practice or as compensation to determine whether they reasonably reflect the fair market value of the practice or the services rendered, in order to determine whether such items in reality constitute remuneration for referrals. Moreover, to the extent that a payment exceeds the fair market value of the practice, or the value of the services, it can be inferred that the excess amount paid over fair market value is intended as payment for the referral of program-related business.

When considering the question of fair market value, we would note that the traditional or common methods of economic valuation do not comport with the prescriptions of the antikickback statute. Items ordinarily considered in determining the fair market value may be expressly barred by the antikickback statutes' prohibition against payments for referrals.... The fact that a buyer in a position to benefit from referrals is willing to pay a particular price may only be a reflection of the value of the referral stream that is likely to result from the purchase.

The Court is mindful that while opinion letters such as this may be considered as persuasive precedent, opinion letters lack the force of law, are not entitled to *Chevron*-style deference, and are not binding in this proceeding. *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). That being said, while it is clear that a hospital's acquisition of a physician's practice could implicate the AKS or Stark, the opinion letter does not state that the circumstances discussed automatically result in a per se violation. To the contrary, the opinion expressly indicates that an examination of the facts and circumstances surrounding the purchase must be made on a case by case basis.

In support of his argument that the practice purchases exceeded their fair market value, Perales cites to the deposition of its expert witness, Robert Keene ("Keene"). After reviewing the representative practice evaluation that was produced in discovery, Keene noted that the report included a projected growth rate for practice revenue of 30% over two years. He then testified that "My comment here is simply that I have not ever seen a practice that was charging 30 percent below what they would be paid a service if they billed ... just that item." (Keene Dep. at 72.) He then acknowledged that other factors such as finding things that weren't billed for, improper coding, neglecting the collection of accounts receivable, and other factors could influence this factor and could have been included in the calculation. *Id.* at 71–73.

Initially, the Court notes that nowhere in the above cited portion of the deposition does Keene condemn the practice evaluation or offer any opinion that the evaluation resulted in the payment of more than fair market value to the Selling Physicians. In fact, Keene stated that he did not review the fee schedule and had no opinion about whether the 30% figure was inaccurate in any way. (Keene Dep. at 73.) When taken in context, the statement Perales relies on is essentially non-probative of any material fact in issue. In fact, Keene repeatedly testified that he found nothing in the practice valuation reports about valuing referrals for the hospital, that he had

no evidence that any money was paid based on the report for referrals to the hospital, and that he had no problem at all with the methodology that was used in the reports.

From this non-probative statement, Perales then jumps to the unsupported conclusion that had SMH "paid what the valuation stated, the payment would thus have been above fair market value and have acted as an inducement to make referrals." This is utterly insufficient to meet his burden as the movant to demonstrate that there are no genuine issues of material fact in issue with respect to the practice purchases, particularly in light of the fact that SMH has introduced evidence from the drafter of the practice evaluation explaining that the 30% growth rate was specific to that particular practice because that particular physician was not pursuing accounts receivable and was charging prices that were below the industry standard, both of which were identified by Keene as legitimate factors that could be considered in this area. The Court has stated before and will now state again, Perales' unsupported beliefs and conjecture, no matter how ardently asserted, do not rise to the level of proof necessary to survive an opponent's motion for summary judgment, much less warrant the granting of his own dispositive motion.

Perales next points to the deposition of Tim Muntz ("Muntz"), SMH's CEO, that was apparently taken in conjunction with another court case. Perales cites to page 37, lines 11–14 for the proposition that SMH purchased these practices to maintain physician allegiance to the hospital, but the text cited supports no such proposition. Similarly, he identifies portions of

pages 43, 44, 47, and 48 for the proposition that purchasing the practices was a way to assure that the business it was getting from the physicians was not going to go elsewhere. Again, the cited references are not supportive of this assertion, leaving his assertions fundamentally unsupported.[3]

During his deposition, Muntz did testify that where a physician had always used more than one hospital, "part of our planning was that some of that allegiance could switch to St. Margaret's in that process." (Muntz Dep. at 42.) When the text surrounding this quotation is also considered, it is clear that Muntz is speaking in conjunction with retaining that physician as an employee after a practice purchase and not just with respect to a practice purchase in and of itself. He also stated that in purchasing a practice, SMH wanted to obtain the "[physician] compliment (sic) that is necessary to be of service in the way that we—to maintain the level of services that we have built up," which is certainly suggestive of the desire to retain the physician's services in the area in order to compete with other area hospitals. (Muntz Dep. at 33.) While Muntz acknowledged that a desire to retain patient flow from doctors that might take their patients to another hospital by affiliating with a competitor was also a consideration, SMH's internal thought process that patients might keep coming to SMH after a practice purchase and employment situation is a far cry from an admission or even circumstantial evidence that SMH paid for the value of future referrals in purchasing those practices. (Muntz Dep. at 46.)

Perales also makes much of the fact that his calculations of billing records indicate

---

**3.** The Court notes that the same is true of other references in Perales' motion. For example, on page 19 of the motion, Perales cites page 40, lines 18–19 of Keene's deposition for the proposition that SMH's consultant's eval-

uation report provides no evidence that the value of a stream of referrals was excluded from the valuation. However, the text at that citation states that in the report, "there's no indication of who the buyer is."

that the Selling Physicians generated over $53 million in billings to government payors during the relevant time period. However, that in and of itself, is unremarkable as the vast majority of the Selling Physicians became employees of SMH following the sale of their private practices, which would necessarily result in the generation of revenues on behalf of the hospital. He then assumes without any cited support in the record that SMH induced the practice purchases by offering above fair market value prices that contained a component for the value of future referrals. Again, where's the beef? Where is the expert opinion indicating that this is evidence of an improper inducement? Where is the expert opinion identifying a purchase price that was above the fair market value for the practice? What does Perales contend was the fair market value of the purchases? Perales cannot extrapolate such a conclusion from the bare bones that he has offered in the record here, and his attempt to do just that is unavailing. Even when the *facts* are construed in the light most favorable to Perales, he would not have met the threshold necessary to have his motion granted or to survive SMH's motion.

Perales then states that SMH paid more for non-compete agreements with Selling Physicians than it paid to physicians who were already its employees. With all due respect, so what? Physicians with established practices have more of an ability to compete with other hospitals than physicians who have always been employees of the hospital and whose patients have therefore also been clients of the hospital. There is nothing logically sinister about this fact, and Perales has produced no facts casting any legitimate suspicion in this respect. More importantly, this detail, even if accepted as true, does not establish that the practice purchases were for more than fair market value.

As very aptly stated by an esteemed colleague, Judge Moran, in the Northern District of Illinois:

> The Anti–Kickback Act does not prohibit hospitals from acquiring medical practices, nor does it preclude the seller-doctor from making future referrals to the buyer-hospital, provided there are no economic inducements for those referrals. To comply with the statute, the hospital must simply pay fair market value for the practice's assets.

*U.S. ex rel. Obert–Hong v. Advocate Health Care*, 211 F.Supp.2d 1045, 1049 (N.D.Ill.2002). Similarly, a hospital's purchase of a medical practice could implicate Stark's prohibition on financial relationship between referring physicians and hospitals benefitting from such referrals. However, as Judge Moran noted, "the statute contains an exception for isolated transactions. Purchasing a doctor's practice outright would seem a quintessential example." *Id.* at 1050. Despite allegations concerning future referrals based on an employment relationship, in the absence of evidence suggesting "why the acquisitions themselves should not qualify as isolated transactions," such an allegations must necessarily fail. *Id.*

Although the Court could infer that any excess amounts paid over fair value was intended to induce referrals, Perales has failed to demonstrate what the fair market value of the practices in question was, much less that there were any amounts paid in excess of the fair market value that could be attributed to an improper inducement. *See Id.* at 1049, *citing United States v. Lipkis*, 770 F.2d 1447 (9th Cir.1985). Perales suggests that he has somehow been prevented from demonstrating the fair market value of these practices by the fact that the Court refused to allow him to rummage through the confidential financial information of his competitors absent some

specific, articulable basis for suspecting impropriety. Despite the production of the practice purchase agreements themselves, as well as a copy of a redacted practice evaluation (which resulted from the Court reviewing the documents *in camera*), and the opportunity to take depositions and other discovery over a four year period, he has been unable to supply the Court with any reasonable and legitimate basis for any suspicion of impropriety. He knows the amounts that were paid for non-compete clauses and/or goodwill, the amounts attributable to the physical assets of the practice, the total purchase prices, the factors that were considered, and has had access to the methodology that was used to compute the underlying evaluations. Between this information and the opportunity to take further depositions, he had more than sufficient access to address the question of fair market value. The Court put him on notice on more than one occasion that he must do more than make bald allegations of impropriety or face the dismissal of his claim, and his failure or inability to heed this warning now brings that consequence to pass.

In summary, Perales' espoused theory of the case is that because the prices paid for the practice purchases were above fair market value and did not exclude the value for an expected stream of referrals, the succeeding referrals violated the AKS and Stark and rendered claims for those services false. Given this theory, his failure to introduce evidence demonstrating that the purchases were for more than fair market value is fatal to his motion and simultaneously justifies the granting of SMH's corresponding motion. As the record is devoid of evidentiary support for Perales' assertion that any of the identified practice purchases were for more than fair market value, he has failed to show any violation of either the AKS or Stark upon which a false claim could be predicated, and his claim is therefore without sub-

stance. Perales' Motion for Partial Summary Judgment must be denied, and SMH's corresponding Motion for Partial Summary Judgment No. 3 will be granted.

## II. *SMH's Motions for Partial Summary Judgment*

### A. *Motion No. 1—Perales' Relationship With SMH*

■ SMH moves for summary judgment on the allegations in Counts 13–88 of the Complaint that the financial relationship between SMH and Perales required referrals that violated the AKS and Stark statute. Specifically, Perales has alleged that the Services Agreement covering the time period from March 1, 1989, through February 28, 1992, did not allow him to refer certain services to commercial laboratories and/or providers other than SMH and did not allow him to perform the services himself. However, Perales alleges in ¶ 98 of his Complaint that he did not abide by the contractual restriction on referrals and confirmed during his deposition that he stopped abiding by the terms of the contract in 1990 and never personally made an illegal referral to SMH. Thus, SMH argues that absent any illegal referral by Perales, no false claims could have been submitted based on Perales' services that could form the basis for a FCA violation.

It has previously been established through state court litigation that the terms of Perales' Services Agreement itself were illegal and unenforceable. Perales argues that the offense under the AKS is complete when the inducement is offered to make improper referrals. Assuming that is accurate, this is not a prosecution under the AKS, but rather an FCA case, the success of which depends on the evidentiary establishment of at least one timely claim submitted to the government for payment that has been rendered false

by reason of the improper referral relationship.

Initially, the Court observes that civil actions alleging violations of the FCA may not be brought more than six years after the date on which the violation of § 3729 is committed or more than three years after the date when facts material to the action were or reasonably should have been known, whichever occurs last. 31 U.S.C. §§ 3731(b)(1)-(2); *Neal v. Honeywell, Inc.,* 33 F.3d 860, 862, 865 (7th Cir.1994). The opinion in *Neal* makes it clear that the violation is the filing of the false claims themselves. *Id.*

This lawsuit was not filed until October 21, 1998. Accordingly, only claims submitted for payment after October 21, 1992, can possibly form the basis for this action. As Perales' illegal Services Agreement expired by its own terms on February 28, 1992, only referrals made during that time would be necessarily tainted by the illegal contract. It would seem highly unlikely that any claims resulting from referrals made pursuant to that contract were not filed for payment for at least nine months following the referral.

Although Perales makes a minimal effort to argue that his contract with SMH continued in practice until 1995, this argument is unpersuasive as he was not actually bound by any illegal, referral-inducing agreement after February 28, 1992, and he has indicated that he no longer considered himself to be bound by the agreement long before it technically expired. The fact that SMH expected Perales to reimburse it for staff assigned to his office who continued to work there after the expiration of his Services Agreement simply cannot be logically extended to the proposition that all other aspects of the expired agreement also remained in full force given the facts of record in this case. Taking Perales' theory to its logical conclusion would result in the liability of any individual who has at

some point acted pursuant to an improper referral inducement being extended in perpetuity after the inducement is no longer present. This the Court is unwilling to do, particularly in absence of any authority indicating that the taint continues once the improper referral inducing contract is no longer in effect. Such an extension is not only bad policy, but it is also inconsistent with the purposes of the FCA and AKS.

Perales makes mention of the patients identified in his complaint. However, the vast majority of these services were provided well outside the statute of limitations. It is undisputed that SMH's usual and customary billing procedure is to submit all claims within 30 days of the completion of services, and Perales has provided no evidence indicating that for some reason the claim was delayed long enough to have been submitted within the limitations period. Accordingly, the Court is at a loss to see how these incidents could possibly constitute evidence of actionable false claims. The remaining eight services identified, although timely, occurred months and even years after the contract providing the improper inducement relationship ended, and the Court has rejected the argument that the taint of the formerly improper relationship continues in perpetuity. Accordingly, none of the patients or services specifically identified in the complaint demonstrates a timely false claim.

Perales also makes vague mention of some 69,000 claims submitted by SMH from 1995 through mid–2000. However, he makes no effort to demonstrate that any of those claims resulted from referrals made by him pursuant to an improper inducement or financial relationship. He states that the mere fact that these 69,000 claims exist is sufficient to raise a genuine issue of material fact to defeat summary judgment. This assertion reflects a misinterpretation or fundamental misstatement

of the law: a party resisting summary judgment "may not rest upon the mere allegations or denials" but rather must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). It is clearly Perales' obligation in resisting summary judgment to set forth *facts*, and his vague generalities and "surely somewhere in that mountain of paper supports my claim" attitude are utterly insufficient to meet his burden. Despite years of discovery, he has not been able to introduce *facts* evidencing that he made any referrals for services that resulted in the submission of a false claim.

■ Even assuming arguendo that Perales could remove the statute of limitations bar in this case, he must still demonstrate the filing of a false claim. Perales contends that the actions of a nurse in his office, Jeanne Thompson, resulted in the filing of false claims. Specifically, he suggests that although he never made any illegal referrals personally, never specified a provider when he ordered tests or other services unless the patient specifically requested that he do so, and never personally specified SMH as the location for such services to be performed, Thompson routinely directed the patients to SMH for services and tests despite his directions to the contrary. With all due respect, this interpretation turns the relevant statutory provisions on their head. It was Perales, not Thompson, who had the contract that contained an improper inducement, and he, by his own admission, played no role in determining which facility a patient would go to for the services that he prescribed. If Perales' interpretation were correct, a physician could find himself criminally liable for the actions of another person where he did nothing more than write up a ge-

neric order for services that could have been performed anywhere in the country or simply because a patient took an order for services that the physician prepared and went to SMH completely of the patient's own accord. This result would be absurd, and the new Stark regulations will contain an exception for indirect referrals. 66 Fed.Reg. 856, 872 (Jan. 4, 2001).

Stark prohibits referrals where a *"physician"* has a non-exempt compensation arrangement with an entity and the *physician* makes a referral *"to the entity."* 42 U.S.C. § 1395nn. Similarly, the AKS applies where a person (or in this case entity) offers or pays remuneration *to any person* "to induce *such person* ... to refer an individual *to a person* [or in this case entity] for the furnishing or arranging for the furnishing of any item or service...." 42 U.S.C. § 1320a–7b(b)(2). Clearly, both statutes contemplate that the person receiving the inducement is the one who is prohibited from making the referral to the entity that offered the remuneration. The fact that some of the patients that he attended may have received services at SMH either by their own choice or after consultation with Thompson does not meet this standard. As the facts of record in this case do not establish that any such violation occurred even when construed in the light most favorable to Perales, he has therefore failed to demonstrate any genuine issue of material fact requiring resolution by a jury, and SMH's Motion for Partial Summary Judgment No. 1 shall be granted.[4]

**B.** *Motion No. 4—Valuation of Non Compete/Goodwill*

■ In this motion, SMH challenges Perales' allegation that SMH improperly allo-

---

4. Perales argues at length that the definition of referral is broad enough to encompass the situation that occurred in this case. However, SMH does not challenge that Perales

made referrals, but rather only that he made referrals *to the entity* that was purportedly engaging in the improper inducement.

cated and paid a portion of the purchase price of the physician practices for a non-compete clause and/or goodwill. Specifically, SMH has offered evidence that in purchasing the identified physician practices, it paid fair market value and that no part of the purchase price was a payment for anticipated referrals. To the extent that Perales' resistance to this motion is based in part on his excess of fair market value assertion, such assertion has previously been rejected in Part I of this Order, and the same result in favor of SMH necessarily applies here. The only additional wrinkle here is the question of the non-compete agreements and/or goodwill payments.

In response, Perales again suggests that he was not given the access necessary to develop his claim, and complains about the disparity between the amounts paid to the Selling Physicians for non-compete clauses and the amounts paid to doctors who were already SMH employees. For the same reasons set forth in connection with Perales' Motion for Partial Summary Judgment, the Court respectfully disagrees and rejects these arguments as inapposite. Perales points to the purported failures of SMH to satisfy him regarding the amounts paid for non-compete clauses and/or goodwill. However, as SMH has met its initial burden in moving for summary judgment, it is Perales who must come forward with facts supporting his cause of action. He cannot simply point vague fingers of speculation at SMH and expect to clear that hurdle and sail forward to a trial based solely on bald conjecture. Again, to paraphrase Judge Moran, there is nothing illegal per se about a hospital acquiring a physician's practice, the existence of a non-compete agreement, or entering into a subsequent employment contract with that hospital; something more is required to make this conduct illegal, and it is evidence of this something more that is absent here. At this stage of the litigation,

his failure to produce *relevant, material facts* is fatal.

### C. *Motion No. 5—Loans*

■ In its fifth motion, SMH contests Perales' allegations with respect to loans made to certain physicians. Specifically, Perales alleges that SMH made loans to Drs. Bailey, Inciong, Ramirez, Tun, and Perona. He asserts that these loans were made to physicians who were in a position to make referrals to SMH and should be considered illegal remuneration paid to induce such referrals under Stark because they do not qualify for the physician recruitment exception.

There is an exception to the prohibitions in Stark for remuneration in connection with physician recruitment.

In the case of remuneration which is provided by a hospital to a physician to induce the physician to relocate to the geographic area served by the hospital in order to be a member of the medical staff of the hospital, if—(A) the physician is not required to refer patients to the hospital, (B) the amount of the remuneration under the arrangement is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician, and (C) the arrangement meets such other requirements as the Secretary may impose by regulation as needed to protect against program and patient abuse.

42 U.S.C. § 1395nn(e)(5). Here, it is undisputed that each physician to whom a loan was made was charged an appropriate amount of interest. The interest rates set by SMH involved a process whereby SMH would contact its accountants who then verified the then applicable interest rate published by the IRS. It is also conceded that each of the physician loans has been repaid in full.

Perales contends that the 1994 loan to Dr. Perona could not qualify as physician recruitment because Dr. Perona did not start working for SMH until April 1996. However, the Court rejects this contention because the evidence cited in support of the proposition that Dr. Perona did not start working until April 1996 does not support that proposition. Furthermore, the Employment Agreement between Dr. Perona and SMH clearly states that the term of the agreement shall be from September 1, 1994, through August 31, 1998, and was signed by Dr. Perona on September 27, 1994. Accordingly, the evidence of record demonstrates that the 1994 loan to Dr. Perona was part of a physician recruitment effort.

It is undisputed that the loans to Drs. Bailey (1991), Inciong (1992), Ramirez (1992), and Tun were part of a recruitment program. However, Perales asserts that these loans, as well as the loan to Dr. Perona, fail to meet the stated requirements for the recruitment exclusion under Stark because they were required to refer patients to the hospital and precluded from referring business to another entity. In support of this assertion, Perales argues that some of these physicians were required by their employee agreements to refer business to SMH. However, the identified paragraphs in the employment agreements do not reasonably support this contention. The paragraphs cited do nothing more than set general work hours for the employee, prohibit or govern the maintenance of private practices outside of the physician's employment with SMH during the term of the agreement, provide that the physician will devote full time and best efforts to his employment, arrange for the provision of support services and support personnel, procedures for using/revising a schedule of charges, establish a confidentiality clause regarding the terms of the

employment agreement, and provide that the physician will be an employee of SMH, and as such subject to the withholding of tax, insurance, etc., from his compensation. These are the customary and normal indicia of a bona fide employment relationship, and "these perquisites are subject to the bona fide employee exception." *Obert–Hong*, 211 F.Supp.2d at 1049. The suggestion that such details in and of themselves constitute a requirement for illegal referrals is ludicrous, and there has been no showing here that they were unreasonable or somehow required unlawful referrals.

 Perales points to a provision in some of the employment agreements that essentially states that the physician agrees to utilize SMH and physicians employed by SMH when requesting consultations or referrals for services to his patients to the extent that they are available. However, the new Stark regulations expressly recognize that mandatory referral provisions such as this can be permissible, 66 Fed. Reg. 856, 877 (Jan. 4, 2001), and "[t]here is nothing in [Stark] that prohibits hospitals from requiring that employee physicians refer patients to that hospital. Provided that compensation arrangements are not contingent on the volume or value of referrals, there is no economic incentive for the doctor to refer patients to that hospital." *Obert–Hong*, 211 F.Supp.2d at 1050.

As an attempt to demonstrate a volume based contingency, Perales identifies a provision in some of the contracts requiring that the physician maintain active status with the hospital. Because active status is defined (in the version of the bylaws cited by Perales) as "those physicians, dentists, and podiatrists who attend, admit or are involved in the treatment of at least 12 patients per year at the hospital," he contends that an active status requirement amounts to a volume based referral requirement.[5] However, this contention is

---

5. The 2001 version of the Medical Staff By-

laws states that "Active Staff shall consist of

belied by the very wording of the bylaws, which are clearly a mere method of classification and not a referral requirement.[6] As further evidence that the requirement that a physician maintain staff privileges is not considered by the implementing agencies to be actionable, the Court notes a provision in implementing regulations for the recruitment exception under the AKS that expressly acknowledges that "the entity may require as a condition for receiving benefits that the practitioner maintain staff privileges at the entity." 42 CFR Part 1001.952(n)(4). Although this implementing regulation may not have been in effect at the time that the contracts were entered into, it is a clear manifestation and clarification of the position of CMS that theories such the staff privileges argument asserted by Perales are not actionable.

■■■ Perales also argues that a 1998 loan to Dr. Bailey, a 1994 loan to Dr. Inciong, and a 1994 loan to Dr. Ramirez were not for purposes of recruitment as these physicians were all on active staff status with SMH when the loans were made and continued to be on active staff status throughout the payback period of the loans. This argument is based on the same "active status" argument that has previously been rejected, as the Court finds that "active status" is a mere classification mechanism rather than a volume based referral requirement.

Stark does not impose any per se prohibition on loans from a hospital to a physician. Rather, assuming that what amounts to a payment plan to bring current an existing debt even qualifies as a compensation arrangement under Stark,

CMS has clarified that compensation arrangements at fair market value are generally permissible.

We have taken steps in our proposed regulations to clarify the law and create appropriate flexibility. One of the most important provisions establishes that *referrals to an entity with which a physician has a compensation arrangement are generally permissible as long as the compensation is at "fair market value," furthers a legitimate business purpose, and is not tied to the volume or value of physician referrals.* This exception goes a long way in simplifying the policy under the law....The proposed regulations include several clarifications and create new exceptions, providing flexibility for physicians while not compromising the intent of the law. They: create a "fair market value" exception *to make clear* that compensation arrangements are generally permissible as long as they are at fair market value, further a legitimate business purpose and are not tied to the volume or value of physician referrals. Physicians must simply put in writing the terms of their arrangements, the items or services the physician will provide, and the time period involved. The agreement must be commercially reasonable and not based on the volume or value of referrals made, and must comply with the anti-kickback statute....

May 13, 1999, Testimony of Kath Buto, Deputy Director of CMS Center for Health Plans & Providers on Physician Self–Referral Regulations Before the

---

those physicians, dentists, and podiatrists who admit at least 20 patients per year at the hospital."

**6.** Additionally, the Court notes that under the plain terms of this version of the bylaws, active status can be maintained by simply

being involved in the treatment of 12 patients, which would not necessarily involve any referrals by the physician subject to the active status requirement as they could be admitted pursuant to the directive of another physician and seen only for purposes of consultation.

House Ways and Means Health Subcommittee (emphasis added).

The record indicates that the loans at issue were made for purposes of permitting payment over time of debts that the physicians already owed to SMH, which appears to be a legitimate business purpose, and Perales has introduced no evidence to the contrary. There is no valid indication that these loans were contingent on a referral requirement or that the amount of or interest rate for the loans took into account the volume or value of any referrals. All of this, in conjunction with the undisputed facts that the loans were at a market rate of interest and were paid in full, negates the existence of any potentially viable Stark claim based on these loans. SMH is therefore entitled to summary judgment on its fifth motion.

### D. *Motion No. 6—Dr. Bailey Agreement*

 SMH's sixth motion addresses the Guaranteed Physician Compensation Agreement between itself and Dr. Bailey. Beginning in 1990, SMH made efforts to recruit Dr. Bailey from Peoria, Illinois, to the Spring Valley/Peru/LaSalle area. The agreement was signed in September 1990, and the effect of the agreement is that if Dr. Bailey was unable to make a certain income during the relevant time periods, SMH would provide the difference. No funds were paid pursuant to this agreement, with the exception of a $14,000 advance made to him in 1990.

SMH contends that this agreement was part of its recruitment efforts of Dr. Bailey. Perales again challenges that this agreement was part of the recruitment effort, because it contains a guaranteed revenue provisions that did not take effect until August 1991 and also contained an Addendum providing for a second year of guaranteed compensation from August 1992 through July 1993. Quite frankly,

the Court is at a loss to see how the fact that the agreement provides for a future implementation date and schedule of events precludes it from qualifying as a recruitment effort. Perales' unsupported conjecture to the contrary is unavailing. It would seem only reasonable that a physician who is just completing his residency and having to relocate would need some time to get up and running.

Again, Stark has an exception for remuneration which is provided by a hospital to a physician to induce the physician to relocate to the geographic area served by the hospital in order to be a member of the medical staff of the hospital, if the physician is not required to refer patients to the hospital, the amount of the remuneration under the arrangement is not determined in a manner that takes into account the volume or value of any referrals by the referring physician, and the arrangement meets such other requirements as the Secretary may impose by regulation. 42 U.S.C. § 1395nn(e)(5). Here, there is nothing in the terms of the compensation agreement that would support any legitimate claim that the amount of Dr. Bailey's compensation was determined in a manner that took the volume or value of referrals into account.

Perales asserts that the requirement that Dr. Bailey "maintain appropriate privileges in good standing within the Hospital's Medical Staff credentialling process" as evidence of a referral requirement. However, the Court has previously rejected the argument that active staff status implicated a referral quota, and the agreement with Dr. Bailey does not even require that he maintain active status but rather only "appropriate privileges." This attempt to demonstrate the existence of an improper referral requirement is likewise without merit.

Perales also points to Dr. Bailey's agreement "[t]o make a 'good faith' effort to use Hospital." However, that statement is followed by the express permission "to admit patients elsewhere if patient so requests, or if in Physician's professional opinion, necessary procedures should be performed at another hospital." The final regulations promulgated by CMS on behalf of the Department of Health and Human Services have clarified that CMS does not consider the volume or value standard to be implicated by "otherwise acceptable compensation arrangements for physician services solely because the arrangement requires the physician to refer to a particular provider as a condition of payment." 66 Fed.Reg. 856, 877 (Jan. 4, 2001). Provided that the contracts provide exceptions when the patient expresses a different choice, when the patient's insurer determines the provider, or when the referral is not in the best medical interest of the patient in the physician's judgment, and the payment is fixed in advanced for the term of the agreement and is consistent with fair market value for the services performed, CMS has clarified that such a referral requirement will not vitiate an exception. *Id. See also*, 42 C.F.R. § 411.354(d)(4). Here, the compensation agreement provided the necessary exceptions and fixed the level of compensation for the term of the agreement. Although Perales asserts that there is no fair market value for allowing Dr. Bailey to operate his practice with the safety net of a compensation guarantee, his unsupported conclusion has no evidentiary value and adds nothing to this case. As there has been no evidentiary demonstration that the amount of compensation indicated in the agreement was more than fair market value for Dr. Bailey's services, the Court

finds that CMS would not consider the referral clause in this agreement to be actionable.[7]

Furthermore, Dr. Bailey's compensation agreement states that he was acting as an independent contractor. Although this would not meet the exception for a bona fide employment relationship, the AKS and Stark also exclude remuneration pursuant to personal services contracts. Payments made by the principal to the agent, which is defined as "any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal, are not considered to be "remuneration" under the statute if seven standards are met:

(1) The agency agreement is set out in writing and signed by the parties. (2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent. (3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals. (4) The term of the agreement is for not less than one year. (5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal

---

7. Parenthetically, the Court would note that under the recent interpretations and clarifications from CMS, it is unlikely that Perales'

own compensation that expired in 1992 would have been found problematic.

health care programs. (6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law. (7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services."

42 C.F.R. § 1001.952. A substantively similar exception for Stark is found at 42 U.S.C. § 1395nn(3)(A).

Here, the agreement was set forth in writing and signed. The agreement states that Dr. Bailey was being contracted with on a full-time basis to develop and continue a clinical practice in Granville, Illinois, that he would: reimburse SMH for the costs of clinic personnel and space after then initial one-year period; maintain normal and customary office hours in accordance with physicians schedule including inpatient and emergency room visits at SMH; maintain licensures and appropriate privileges; report any suit or litigation; provide emergency room coverage; participate in the affairs of the hospital; and provide community education seminars. The term of the agreement covered at least a one-year period. The aggregate compensation was set in advance; there is no evidence indicating that the amount of compensation was inconsistent with fair market value or took into account the volume or value of referrals or business generated. The services did not involve the counseling or promotion of a business arrangement that violates the law, and the Court sees no basis for concluding that the aggregate services contacted for exceed those which were reasonably necessary to accomplish the commercially reasonable business purposes for the service. Accordingly, it would appear that Dr. Bailey's compensation agreement would be excluded from consideration as "remuneration" under the AKS.

Moreover, employment contracts that require mandatory referrals to the employer have been held to be non-actionable under either the AKS or Stark, as those statutes "are designed to remove economic incentives from medical referrals, not to regulate typical hospital-physician employment relationships." *Obert–Hong*, 211 F.Supp.2d at 1050. The Court sees no logical reason why the same policy considerations should not apply to a compensation agreement that essentially functions like an employment agreement but under which the physician technically maintains independent contractor status.

For all of these reasons, no reasonable jury could find in favor of Perales on his claim regarding Dr. Bailey's compensation agreement, and SMH is entitled to summary judgment on this issue.

### E. *Motion No. 7—Leases*

■■■ Perales contends that certain leases between SMH and others result in improper financial relationships, specifically the Illinois Valley Eye Institute Agreement dated August 30, 1991; a lease with Dr. Padilla for a CO2 laser dated 1990, and a part-time lease with Oncology/Hematology Associates dated 1992.

Both the AKS and Stark contain exceptions for equipment and space rental leases. With respect to equipment rentals, Stark indicates that payments made by the lessor to the lessee are not a compensation arrangement if:

(i) the lease is set out in writing, signed by the parties, and specifies the equipment covered by the lease, (ii) the equipment rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee when being used by the lessee, (iii) the lease provides for a term of rental or lease of at least 1 year, (iv)

the rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties, (v) the lease would be commercially reasonable even if no referrals were made between the parties, and (vi) the lease meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(1)(B). The AKS contains a similar exception:

As used in section 1128B of the Act, "remuneration" does not include any payment made by a lessee of equipment to the lessor of the equipment for the use of the equipment, as long as all of the following six standards are met—(1) The lease agreement is set out in writing and signed by the parties. (2) The lease covers all of the equipment leased between the parties for the term of the lease and specifies the equipment covered by the lease. (3) If the lease is intended to provide the lessee with use of the equipment for periodic intervals of time, rather than on a full-time basis for the term of the lease, the lease specifies exactly the schedule of such intervals, their precise length, and the exact rent for such interval. (4) The term of the lease is for not less than one year. (5) The aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or all other Federal health care programs. (6) The aggregate equipment rental does not exceed that which is reasonably necessary

to accomplish the commercially reasonable business purpose of the rental.

42 C.F.R. § 1001.952(c). Both statutes also have substantively similar exceptions for the lease or rental of office space, which are set forth at 42 U.S.C. § 1395nn(e)(1)(A) and 42 C.F.R. § 1001.952(b) respectively.

### 1. *Illinois Valley Eye Institute Equipment Lease*

This lease provides that the Institute is the owner of a Site Phacoemulsification Modifier that is used to perform eye surgery, and SMH is a hospital with facilities to perform these surgeries. The agreement is for a five year period, during which the Institute will bring the equipment to the hospital to perform scheduled surgeries. Under the arrangement, SMH would pay the Institute $75.00 for each surgery performed at the hospital using the equipment. There is no contention that the lease does not cover all of the equipment leased or that the aggregate rental exceeds that which is reasonably necessary to accomplish the commercially reasonable business purpose of the rental.

Perales concedes that Stark is not applicable because this lease expired prior to 1995, but challenges the applicability of the AKS exception because under this lease, the Institute controls how much the equipment is used, which in turn controls how much they are paid under the lease, as the rent is set on a per surgery basis. He therefore contends that the physicians are induced to use the equipment frequently since their total payment under the lease is increased with each use. He also argues that no aggregate rental charge is set in advance, and that the amount of the lease is not consistent with fair market value.

Initially, the Court notes that since Perales has made no attempt to introduce

admissible evidence on the question of fair market value, his argument in this respect is unavailing. Moreover, CMS has now clarified that its prior interpretation of this exception, a slightly altered version of which is relied on by Perales, is inconsistent with the Congressional intent behind the legislation and will no longer be followed. 66 Fed.Reg. 856, 876 (Jan. 4, 2001). Specifically, CMS states:

> We have reviewed the legislative history with respect to the exception for space and equipment leases and concluded that Congress intended that time-based or unit-of-service-based payments be protected, so long as the payment per unit is at fair market value at inception and does not subsequently change during the lease term in any manner that takes into account DHS referrals.

*Id.* In other words, "per use" payments such as those at issue in the Institute lease are permissible even for patients referred by the Institute, as long as the "per use" rental payment was at fair market value, did not vary over the lease term, and met the other requirements of the rental exception. "In determining whether the initial 'per use' payment is at 'fair market value,' we will generally look to the price a hospital would pay to rent the equipment from a company that did not have any physician ownership or investment . . . in an arm's-length transaction." *Id.*

As the aggregate rental charge is no longer a requirement in the wake of CMS' clarification that "per use" arrangements are to be protected, and Perales has failed to make any attempt to demonstrate that the $75.00 per surgery rate is not fair market value for the use of the Site Phacoemulsification Modifier, the Court finds as a matter of law that the Institute's equipment lease does not form any basis for a FCA claim.

## 2. *Padilla Equipment Lease*

■ This lease provides that Dr. Padilla will provide the specified laser equipment, and SMH will provide adequate space for him to provide services using the equipment. The agreement is for a period of two years and provides for payment on a monthly basis. Payment is calculated at a rate of $40.00 for any procedure in which the laser time is less than 15 minutes; for procedures in which the laser time is 15 minutes or more, the rate will be $75.00 for the first 15 minute period and $15.00 for each additional 15 minute interval.

Perales concedes that Stark is not applicable because this lease expired before 1995, but contends that like the Institute's lease, there is no aggregate rental rate set in advance, and the actual amount to be paid to Dr. Padilla can vary depending on how much he uses the equipment. He further argues that the agreement does not meet the "not less than one year term" requirement because it is terminable at will and terminable for cause with no restriction upon the ability of the parties to enter into a new agreement within one year.

The Court first notes that Perales' arguments with respect to the aggregate rental rate and amount of rental varying on usage fail under CMS's recent clarification for the same reasons as those set forth above with respect to the Institute lease. That leaves the contention that the term of the lease agreement does not meet the "not less than one year" term requirement. In this respect, Perales cites advisory comments from the Office of the Inspector General indicating that "for cause" and "without cause" termination provisions in a lease could be problematic because such provisions "could be used by unscrupulous parties to create sham leases and contracts. . . . Parties could disguise payments for referrals by terminating the agreement

without cause after payment, but before performance of any services." 64 Fed. Reg. 63518, 63526 (Nov.1999). However, to extrapolate from that comment to the contention that such provisions automatically preclude the availability of the exception is unreasonable and unsupported, as it is abundantly clear that leases are to be considered on a case-by-case basis. In fact, even the Inspector General has noted that "Safe Harbors do not define the scope of legal activities under the anti-kickback statute. Part-time, as needed, and other similar arrangements that cannot fit within the Safe Harbor may be lawful if no payments are made, directly or indirectly to induce referrals of federal health care program business." 64 Fed.Reg. 223 (Nov. 1999).

The lease at issue in this case does not involve the hypothetical possibilities for abuse on which Perales relies; it is a lease that expired more than seven years ago, and the record is devoid of any evidence indicating that this lease was terminated without cause or renegotiated in a manner suggestive of abuse or an attempt to conceal payments for referrals. The Inspector General's comments reveal that the policy behind the concern is that the one-year term requirement "ensures that protected leases or contracts cannot be readjusted frequently based on the number of referrals between the parties." There is no pro se prohibition on the presence of termination clauses. The agreement on its face specifies a term of two years, and there is simply no factual basis in the record for finding that Dr. Padilla's lease was terminated in a way that would implicate the Inspector General's concerns. As he has made no attempt to show that the lease was not for fair market value or otherwise demonstrate that payments under the lease were specifically for referrals, Perales has failed to present any genuine issue of material fact, and this lease cannot form the basis for a FCA claim.

### 3. Oncology/Hematology Associates Space Lease

The September 17, 1992, Office Lease between SMH and Ocology/Hematology Associates is for a space consisting of 1,462 square feet on the first floor of the hospital for a one year period, with automatic renewal provisions for additional one year terms. The rental rate is set at $700.00 for each day in which the renter sees or treats patients in the premises, with the expressed intent that patients will be seen one day per week.

Perales concedes that Stark is not implicated because the lease did not extend beyond 1993, but argues that the "Additional Covenants" paragraph in the lease expressly requires the lessee to use the services of the hospital in the form of pharmaceuticals and medical supplies. He further contends that the lease does not meet the one-year requirement, as it is terminable by mutual consent and terminable for cause with no restriction upon the ability of the parties to enter into a new agreement within one year, and does not set the aggregate rental rate in advance.

As was the case with Dr. Padilla's equipment lease, the Oncology/Hematology lease expired nearly ten years ago, and the record is devoid of any evidence indicating that this lease was terminated without cause or renegotiated in a manner suggestive of abuse or an attempt to conceal payments for referrals. The agreement on its face provides for a one-year term, and hypothetical possibilities aside, there is simply no factual basis for the conclusion that the Inspector General's concerns about improper termination were implicated. Accordingly, based on the facts of this case, the Court finds that this agreement

satisfies the requirement of a lease for at least one year.

The written lease agreement is signed and specifies the premises to be leased by Oncology/Hematology Associates. Rent is set at $700.00 for each day in which staff sees patients in the office and expresses the understanding of the parties that patients will be seen in the office one day per week from 8:30 a.m. to 4:30 p.m. The Court finds this sufficient to comply with the third element of the exception for less than full-time leases. The term of the lease is for at least one year and has an automatic extension provision. The rental charge is set in advance, and the aggregate rental charge can easily be computed by multiplying the rate of $700.00 per week times 52 weeks to arrive at the aggregate rental charge of $36,400.00 per year.[8] Perales has produced no evidence demonstrating that this was not consistent with fair market value or was determined in any way that took into account the volume or value of referrals or business generated; his bald speculation is once again insufficient. Finally, there is no basis for finding that the space rented exceeds that which was reasonably necessary to accomplish the commercially reasonable business purpose of the rental. Accordingly, the Court finds that the Oncology/Hematology Associates lease does qualify for an exception under the AKS, and SMH is therefore entitled to summary judgment on this claim as well.

### F. *Motion No. 8—Active Staff Status*

The Court has previously addressed and rejected Perales' argument that a contractual requirement that a physician maintain active staff status is equivalent to a referral requirement in the prior sections of this Order and need not be restated. Suf-

fice it to say that the category of active status cannot reasonably be construed as a volume based referral requirement when the very wording of the bylaws clearly indicates that levels of physician privileges are merely a mere method of classification. Doctors designated at other levels of classification, such as courtesy staff, associate staff, etc., remain entitled to admit patients to and treat patients in the hospital; they simply are not held to the same level of administrative responsibility. The classification system is nothing more than a customary way of linking a physician's administrative and participatory responsibilities to his/her usage of the facility; physicians who routinely make greater use of the facility are expected to take on more responsibility and become more involved than a physician who seldom uses the facility.

Perales argues that membership on a hospital's staff is an undeniable economic benefit in the form of a chance to make a living, as well as the benefit of having a voice in the hospital's administration and the opportunity to add patient clients by staffing the emergency room. He then complains about the fact that he is denied some of these benefits because he only has privileges as Courtesy Staff, but that is irrelevant to this suit. There is no question that staff privileges at a hospital are a benefit and privilege, but this is not equivalent to an entitlement, and it is ludicrous to suggest that physicians have an automatic entitlement to a certain level of privileges at a hospital. Nor has there been any showing that active staff status is somehow just an improper referral requirement in sheep's clothing, particularly as Perales has admitted that other hospitals with which he has been involved have

---

8. Perales has introduced no evidence establishing that the office space was in fact used more than once a week or that the computa-

tion varied from the formula and understandings set forth in the lease, and there is no reason to assume otherwise.

similar classifications of staff members. To accept Perales' argument would be tantamount to finding that hospitals cannot legally have a mechanism for classifying or regulating the privileges of physicians using its facilities. Such a holding would not only be unsupported by legal authority, but would also be contrary to public policy and violate basic common sense.

Even assuming arguendo that active staff status could somehow be construed as a referral requirement, CMS has clarified, and courts have held, that mandatory referral requirements that are part of bona fide employment relationships are permissible. This Court has also concluded that there is no principled reason why this same policy should not be applied to contracts for personal services that do not technically qualify as employment. CMS has also found in the context of recruitment that "the entity may require as a condition for receiving benefits that the practitioner maintain staff privileges at the entity." 42 CFR Part 1001.952(n)(4). The only physicians with active status requirements that have been identified anywhere in Perales' pleadings in response to the motions for summary judgment have been in either the employment, recruitment, or personal services context. Accordingly, even assuming that his interpretation of the bylaws was entitled to credence, he has failed to specifically identify any physicians who are contractually obligated to maintain active staff status who do not fall into a category where such a requirement is permissible. His bald statement that "[p]hysicians who are otherwise in non-excluded or non-excepted financial relationships under either AK[S] or Stark are contemporaneously required to make referrals to the hospital with which they are financially linked" is unavailing. Hypothetical individuals are insufficient to get Perales past summary judgment, as they do not present a genuine issue of material fact requiring resolution by a jury.

### G. Motion No. 2—All Possible False Claims Act Violations

■ In this motion, SMH argues that even assuming that Perales could introduce evidence that a violation of either the AKS or Stark occurred, the FCA requires that a false statement be made with actual knowledge, deliberate ignorance, or reckless disregard of the statement's falsity. In support of this assertion, SMH has submitted the affidavit of its CEO, Tim Muntz, that he was not aware of any violation of the AKS and/or Stark within the contracts identified by Perales, that he was unaware of any submission to the government which contained a false certification and/or false information of any kind, and that all documents were prepared in consultation with attorneys.

Perales argues that SMH made no effort to ensure that its payments to physicians were consistent with fair market value. That is flatly contradicted by the record, which indicates that practice purchases were made after receiving a market valuation from a well-respected, independent consulting group and that loan rates were set after consultation with SMH's institutional lending advisors to obtain the market rates. The amounts paid under leases or compensation agreements do not appear to be outrageous or otherwise unreasonable. Given this preliminary showing, it is incumbent upon Perales to demonstrate that these arrangements were not actually for fair market value, and he has utterly failed to even attempt to meet this burden.

■ Mere non-compliance with a statute or regulation, in the absence of a false certification, is insufficient to constitute a false statement within the meaning of the FCA. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). In the words of a sister court:

The Supreme Court has cautioned, however, that the FCA is not designed to punish every type of fraud committed upon the Government. *United States v. McNinch,* 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). The FCA is not intended "to operated as a stalking horse for enforcement of every statute, rule, or regulation." *Pogue,* 914 F.Supp. at 1513. To hold that the mere submission of a claim for payment, without more, always constitutes an "implied certification" of compliance with the conditions of the Government program seriously undermines this principle by permitting FCA liability potentially to attach every time a document or request for payment is submitted to the Government, regardless of whether the submitting party is aware of its non-compliance. While ignorance of the law is usually no excuse to justify one's actions, the FCA requires that a false statement be made with actual knowledge, deliberate ignorance, or reckless disregard of the statement's falsity.

*United States ex rel. Joslin v. Community Home Health,* 984 F.Supp. 374, 384 (D.Md. 1997).

The Court agrees that, even when all facts and *reasonable* inferences therefrom are construed in the light most favorable to Perales, evidence that SMH had actual knowledge of false certifications, was deliberately ignorant of potential falsity, or acted in reckless disregard of potential falsity is lacking in this case but for somewhat different reasons than those asserted. Although the affidavit of Muntz in and of itself is not sufficient to prove lack of knowledge on behalf of SMH, a review of the totality of the record reveals that there has been no evidence of actual knowledge of falsity. Perales also points to the 1997 order in the state court litigation finding that Perales' employment agreement was unenforceable as evidence of SMH's knowledge. However, once again, he attempts to read too much into that order and extend it to stand for propositions that it cannot reasonably support. Even if that order could somehow be expanded to cover contracts other than Perales', there was no finding in that case that there was any type of a FCA violation, and the type of compensation agreement addressed in that case had not been used by SMH for some time prior to 1997. Moreover, as set forth elsewhere in this Court's Order, subsequent clarifications from CMS and the Inspector General have indicated that the decision in the state court case may not have been correct. Thus, any suggestion that the state court case demonstrates SMH's actual knowledge of false claims is unavailing.

Second, there has been no showing that SMH buried its head in the sand and wilfully ignored the law; to the contrary, there is evidence that SMH received and considered relevant publications in this area of the law, established a corporate compliance committee, and routinely consulted counsel in drafting the contracts and agreements, which is suggestive of an intent to abide by the law. The fact that SMH may not have immediately recognized or acquiesced to what Perales asserted to be false claims under his novel and in most cases unprecedented theories does not amount to deliberate indifference.

Nor can the record support a finding of reckless disregard. In general, the theories presented by Perales and therefore the process by which any conceivable violation could be demonstrated, are so convoluted and attenuated that it has taken the Court substantial amounts of time to even discern what Perales is talking about, let alone the legal merit of the allegations. He has supposed the existence of illegal inducements for referrals where none are reasonably supported by the evidence. He has attempted to apply hypothetical issues of concern to situations where he has had

full discovery, and the facts are no longer hypothetical.[9] Under these circumstances and given the nature of the theories propounded in this case, the Court cannot conclude that SMH, even assuming that some technical violation of a statute could be demonstrated, acted with reckless disregard for its obligation to present truthful claims to the Government.

Moreover, in ruling on the above motions, the Court has rejected Perales' assertion that the contracts, agreements, arrangements, and theories that he has identified violate the AKS or Stark. Thus, as a matter of law, these documents/arrangements cannot serve the basis for any FCA violation, and SMH could not have knowingly submitted a false certification of entitlement to payment based claims that were purportedly tainted by nonexistent violations of some other statute. Accordingly, SMH's Motion No. 2 shall be granted.

## CONCLUSION

The FCA is a Civil War-era statute that was enacted in response to acts of fraud committed on the military. In the health care context, the statute was initially applied to straightforward acts of patently fraudulent activities, such as claims for services that were never provided or services that were provided but in a manner that differed significantly from that indicated on the claim. In recent years, plaintiffs have attempted to use the FCA to expand beyond these quintessential forms of falsity to reach far beyond the earlier boundaries of precedent. Such is the nature of the claim in this case, which alleges a violation of the FCA indirectly by way of an implied false certification theory based on purported violations of federal anti-referral statutes.

There is a lack of consensus among courts over whether a qui tam plaintiff such as Perales can even use the FCA as a vehicle for pursuing a violation of these statutes (i.e., AKS or Stark) based on a tainted/false certification theory. *See United States ex re. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir.1997); *United States ex rel. Barmak v. Sutter Corp.*, 2002 WL 987109 (S.D.N.Y. May 14, 2002) (noting that the lack of any private right of action in the felony criminal AKS supports the position that violations of that statute should not be enforced civilly through the FCA, but rather should be left to the exclusive jurisdiction of the Department of Justice); *U.S. ex rel. Pogue v. American Healthcorp, Inc.*, 914 F.Supp. 1507 (M.D.Tenn.1996); *Obert–Hong*, 211 F.Supp.2d at 1051 (noting disagreement over whether false certifications of compliance with Stark and the AKS can give rise to a FCA claim.) As the Seventh Circuit has not yet addressed this issue, and the Court has disposed of this case on other grounds, that question need not be resolved here. Parenthetically, however, the Court notes that a review of the claims that have been asserted and proceedings that have transpired in this case could be considered vivid examples in support of the more circumscribed view rejecting Perales' entire "implied certification" theory.

For more than four years, this Court has patiently allowed Perales to exponentially expand on the few facts of which he had personal knowledge and pursue his numerous theories of wrongdoing in this case. Throughout this process, the Court

9. While this may have been sufficient for purposes of pleading and surviving a motion to dismiss, this is the time in the litigation where Perales must place his evidentiary cards on the table. He cannot simply make vague references and assure the Court that he will present evidence at trial, as his failure to present pertinent evidence at the summary judgment stage precludes him from ever reaching trial.

made many efforts in an attempt to encourage Perales to set aside his personal feelings for SMH and instead focus on what could realistically form the basis for a valid and provable FCA claim. From time to time, the Court has even indicated that Perales' explanation of a particular allegation made no sense or seemed to be directly contrary to the law in a further effort to persuade Perales to separate any potential wheat from chaff. Despite these efforts, after years of litigation, substantial expense, and many hours of Court involvement, Perales has brought nothing to the table but chaff. While the Court is not unsympathetic to the fact that Perales may have some legitimate issues with SMH resulting from his former affiliation, those issues are not properly part of this case and cannot be addressed in this litigation.

For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment [# 194] is DENIED, and Defendant's Motion for Summary Judgment Nos. 1, 3, 4, 5, 6, 7, 8, and 2 [# 185, # 187, # 188, # 189, # 190, # 191, # 192, and # 186] are GRANTED. This matter is now TERMINATED, and the existing settings for final pretrial conference and trial are now VACATED.